**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP**
HELEN I. ZELDES (SBN 220051)
*hzeldes@sshhzlaw.com*
JOSHUA A. FIELDS (SBN 242938)
*jfields@sshhzlaw.com*
AYA DARDARI (SBN 344039)
*adardari@sshhzlaw.com*
501 W. Broadway, Suite 800
San Diego, CA 92101
Tel:  (619) 400-4990

**PETA Foundation**
ASHER SMITH (admitted *pro hac vice*)
*ashers@petaf.org*
TALA DIBENEDETTO (admitted *pro hac vice*)
*talad@petaf.org*
MICHAEL E. WALLER (*pro hac vice* application pending)
*mikew@petaf.org*
2154 West Sunset Boulevard
Los Angeles, CA 90026

*Counsel for Plaintiff Amber Takahashi-Mendoza, an individual, on behalf of herself and all others similarly situated.*

**REESE LLP**
MICHAEL R. REESE (SBN 206773)
*mreese@reesellp.com*
100 West 93rd Street, 16th Floor
New York, New York 10025
Tel: (212) 643-0500

**REESE LLP**
GEORGE V. GRANADE (SBN 316050)
*ggranade@reesellp.com*
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Telephone: (310) 393-0070
Tel: (323) 210-2263
Fax: (213) 484-1648

## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Amber Takahashi-Mendoza, an individual, on behalf of herself and all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>Cooperative Regions of Organic Producer Pools d/b/a Organic Valley, a Wisconsin Corporation.<br><br>*Defendant.* | Case No. 4:22-cv-05086-JST<br><br>**CLASS ACTION**<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>1.  **Violation of California's Consumer Legal Remedies Act ("CLRA"); Cal. Civil Code § 1750 *et seq.***<br>2.  **Violation of California's Unfair Competition Law ("UCL"); Bus. & Prof. Code § 17200 *et seq.***<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Amber Takahashi-Mendoza ("Plaintiff" or "Takahashi-Mendoza") brings this action, on behalf of herself and all others similarly situated against Cooperative Regions of Organic Producer Pools d/b/a Organic Valley (collectively "Defendant" or "Organic Valley"). Plaintiff alleges the following based upon information and belief, the investigation of counsel, and personal knowledge as to the allegations pertaining to herself.[1]

## NATURE OF THE CASE

1.      Defendant, one of the largest sellers of organic milk products in the United States, takes in outsized profits off the booming market for humanely produced goods by labeling its products as being manufactured through "Humane Animal Practices."  In reality, Defendant knows its milk is not.

2.      When Plaintiff and others buy "Organic Valley" brand dairy products, they are told they are supporting humane farming practices and pay premium prices for doing so. Instead, Defendant sells them products made through needless cruelty to animals.

3.      Unbeknownst to consumers, the dairy products they purchase come from cows whose calves are stripped from them within days or hours of birth. These calves are then reared in isolation hutches, often in poor health without vital socialization and natural sustenance. Male calves are quickly sold for eventual commercial slaughter, while female calves go on to give birth to calves who are immediately taken away from them. These practices are not "humane" and do not comport with established "highest standards" of animal care "above and beyond other standards"—including provision of "social" settings—that Defendant touts on its labels, but instead renders them false and misleading to reasonable consumers such as Plaintiff. This is especially true given the context of the representations—including, for example, cartons showing a mother cow and calf together in an open field, in direct contrast to Defendant's actual practices.

4.      Defendant's representations are important to consumers seeking humane alternatives to conventionally-produced dairy products. Research shows these consumers are willing to pay more for

---

[1] Plaintiff files this First Amended Complaint with leave of the Court. *Takahashi-Mendoza v. Cooperative Regions of Organic Producer Pools*, No. 22-CV-05086-JST, 2023 WL 3856722 (N.D. Cal. May 19, 2023). She understands this First Amended Complaint to be limited by the Court's prior order granting in part and denying in part Defendant's motion to dismiss, *id.*, and in filing this First Amended Complaint does not advance any claims disallowed by that order except with respect to the Court's dismissal with leave to amend of Plaintiff's claims for equitable relief.

milk from production systems that do not involve premature separation of cows and calves. Defendant and others in the industry know it would pose a risk to dairy sellers' outsized profits if consumers learned the truth: that dairy products found in every grocery store—even many of those marketed as "humane" and sold at premium prices like Defendant's—are ruthless products of socially-deprived calves prematurely separated from their mothers.

5.      Defendant's label statements, targeted to consumers who care about the humane treatment of animals, deceive consumers about the true nature of its business practices and cause Plaintiff and other consumers to pay premium prices. It is these premium prices that regularly provide Defendant more than $1.1 billion in annual sales, including more than $1.2 billion in recorded sales for the year ending 2020.

6.      Defendant should not be allowed to continue its cruelty and fraud. Plaintiff thus brings this action pursuant to: (i) California Business & Professions Code §§ 17200, *et seq.* (the Unfair Competition Law or "UCL"); and (ii) California Civil Code §§ 1750, *et seq.* (the Consumers Legal Remedies Act or "CLRA"). Plaintiff brings this action on behalf of a California class for restitution and any other relief deemed appropriate by the Court, including without limitation, damages, exemplary damages, declaratory relief holding that Defendant's conduct violates California's consumer protection laws, and injunctive relief in the form of an order to remedy and put an end to Defendant's unlawful conduct.

## I.     JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, there are more than 100 members in the proposed class, and at least one member of the class of Plaintiffs is a citizen of a state different from Defendant.

8.      This Court has jurisdiction over Defendant because it carries on a continuous and systematic part of its general business within the State of California.

9.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in, were directed to, and/or emanated from this District. Venue is also proper in this Court pursuant to 28 U.S.C. §§ 84(a) and 1441(a), because this "district and division embrac[e]" Alameda County, where the Complaint was initially filed.

## II.    THE PARTIES

10.    Plaintiff Amber Takahashi-Mendoza lives in Oroville, California, and grew up visiting her uncle's farm. Her experience observing cows with their calves, and calves playing with their companions, influenced her own dietary and purchasing habits. When Ms. Takahashi-Mendoza purchases milk for house guests, she pays substantial premium prices in an effort to ensure she is supporting humane husbandry practices. After seeing Defendant's advertising on its milk cartons, including material representations referenced herein, she began regularly purchasing Defendant's milk at a local grocery store. Based on Defendant's representations, Ms. Takahashi-Mendoza believed Defendant's milk came from cows treated in a humane manner. Had she known the truth, she would not have paid premium prices for Defendant's milk or would not have purchased it at all. Ms. Takahashi-Mendoza would consider purchasing Defendant's milk again if Defendant were to treat cows in a manner consistent with its advertising.

11.    Defendant Organic Valley—headquartered in La Farge, Wisconsin—is one of the largest organic dairy sellers in the world. Defendant markets products in all 50 states and exports to 25 countries. It is organized for the express purpose of "adding value to, and marketing, its members' production," and does so to great effect—regularly reporting annual revenue of more than $1.1 billion, including recorded sales of $1.2 billion for the year ending 2020.[2] At least 18 of Defendant's member farms—whose welfare policies and practices Defendant has oversight and control over, and regularly inspects and investigates—are based in California. Defendant markets and sells its products across California, including in this county.

## III.    FACTUAL BACKGROUND

### Humane Treatment:  What 'Highest Standards' Mean for Mother Cows and Newborn Calves

12.    Various third-party animal welfare standards for cows used in dairy production set minimum thresholds for what the "Highest Standards of Animal Care" would look like with respect to separation of mother cow and calf. For example, one prominent certifier recommends husbandry systems

---

[2] Organic Valley, *Press Release: Organic Valley Upholds Mission to Sustain Family Farms, Hits Record $1.2 Billion in Sales* (Jun. 9, 2021), available at https://www.organicvalley.coop/newspress/organic-valley-upholds-mission-sustain-family-farms-hits-record-12-billion-sales/.

*"that allow young calves to remain in the herd with their mothers until weaning occurs naturally,"* with separation of mother cow and calf to occur only when doing so can "cause as little stress as possible."[3] To qualify for the top two tiers of another certifier's six levels of certification, sellers are required to allow calves to ***stay with their mothers for at least 168 days***, or else to make sure calves are fostered for at least 168 days by another nursing cow who is assigned no more than three calves.[4] Despite its promises, Defendant, on information and belief, does not meet these standards—and so inflicts undue suffering.

### *Cows—Both Mothers and Calves—Are Sensitive, Intelligent Beings With Distinct Personalities*

13.    Studies have shown cows are able to think and observe. They routinely demonstrate robust and rapid learning abilities and express joy when they successfully learn something new. Cows perform well in maze tests and can retain this knowledge for days or even weeks.[5] Cows are also capable of extrapolating knowledge from smaller pieces of information. For example, in one study, cows taught to follow a trolley for food were able, after the trolley moved into a tunnel, to predict the trajectory of the trolley and meet it at the far end of the tunnel.[6]

14.    Cows are also capable of an advanced degree of visual discrimination. Studies have shown they are capable of differentiating not only between shapes, colors, and brightness, but also among more complex dimensions, such as between members of their own species and other animals, and between human handlers whose interactions with the cows are more or less rough, gentle, stingy, or generous.[7]

15.    Cows are acutely sensitive. They experience a wide range of both positive and negative emotional states. Positive emotions include joy, pleasure, and excitement, often manifesting in, for example, play behaviors. But cows can also experience fear and frustration. Fear can manifest in

---

[3] Animal Welfare Approved by AGW, *Certified Animal Welfare Approved by AGW Standards for Dairy Cattle* (last visited May 31, 2022), available at https://agreenerworld.org/wp-content/uploads/2022/02/AWA-Dairy-Cattle-Standards-2021-v2.pdf.

[4] Global Animal Partnership, *5-Step® Animal Welfare Pilot Standards for Dairy Cattle v1.1* (Dec. 9, 2021), available at https://globalanimalpartnership.org/wp-content/uploads/2022/01/20211209-G.A.P.-5-Step-Standards-for-Dairy-Cattle-v1.1.pdf.

[5] *See, e.g.,* Lori Marino & Kristin Allen, *The Psychology of Cows*, 4(4) Animal Behavior & Cognition 474, 479 (2017), https://dx.doi.org/10.26451/abc.04.04.06.2017.

[6] *See, e.g., id.* at 477.

[7] *See, e.g., id.* at 478.

behaviors such as hesitancy to enter new spaces, defecation, vocalizations, and escape attempts. More subtle physical changes are also associated with shifts in emotion, such as nasal temperatures, ear posture, heart rate, and eye widening in which a higher percentage of white space is visible below a cow's upper eyelid. The latter, in particular, is associated with frustration and fear, as are other negative behaviors, such as aggression, repetitive pacing, certain vocalizations, and head-shaking.

16.    They are also very social animals. Like humans, cows are capable of emotional contagion—the spread of positive or negative emotions throughout a group. When one cow exhibits fear or distress in response to a stimulus, other cows who witness her response may also experience fear or distress. Cows also provide emotional support to one another. Studies have shown that following a stressful event, cows will prioritize seeking out a non-stressed companion over food.[8]

17.    Unsurprisingly, cows' cognitive, emotional, and physical wellbeing are all inextricably linked to their social needs. As elaborated below, social rearing and experiences, particularly early in life, are a necessary and crucial part of normal psychological development in cows just as they are in humans. Cows are social herd animals who crave companionship, and calves raised together, as they would be in more natural settings, learn from each other. Bonds between mother cows and their babies from birth through the months-long, normal weaning process are similarly vital to cow development and wellbeing. When cows are allowed to meet these crucial needs, they can thrive. When these needs are unfulfilled, they suffer.

### Defendant's Advertising and Resulting Premium Pricing Induces Justified Reliance

18.    An ever-growing population of American consumers believes it is important that the food industry treat farmed animals—including cows used by the dairy industry—humanely, and with attention to their needs and natural behaviors. Like Plaintiff, many consumers base their purchasing decisions on their perceptions of animal welfare and are willing to pay a premium to sellers who source their dairy products from cows who are treated well and allowed to engage in natural behaviors, like raising their young.

19.    This is borne out by market research. In recent years, animal welfare claims outpaced growth in claims relating to categories like organic ingredients, non-GMO status, and lack of added

---

[8] *See, e.g., id.* at 483-84.

hormones.[9] During fiscal year 2019, the United States Department of Agriculture Food Safety and Inspection Service received over 200 label applications with animal-raising claims each week.[10]  A 2018 survey by a research firm supporting foodservice clients found that close to a third of supermarket industry decision-makers are motivated to stock products that promise better animal welfare, and that 70 percent of those stocking products with humane claims report that sales from these products have increased.[11]

20.    Dairy sellers such as Defendant are well aware of, and monitor and report on, consumer expectations, understanding they have massive ramifications for their operations and outsized profits. A 2018 survey by a national research firm found that 76 percent of consumers shopping at conventional grocery stores, and 87 percent of consumers at premium/natural grocery stores, including consumers of dairy products, say they are concerned about the welfare of animals raised for food.[12]  Results were similar across every demographic group.[13]

21.    Defendant, one of the world's largest dairy manufacturers, goes to extensive lengths, while scaling up its intensive milk production, to market itself as uniquely humane even among other sellers of premium priced, animal welfare branded dairy products. This is not surprising. As Defendant's own vice president of brand management and innovation explained in November 2021, "concerns regarding animal treatment" are "a narrative threatening the dairy industry."[14] But instead of combatting

---

[9] Elizabeth Crawford, *SPINS Data Shines Light on Why 'Consumers Returned to Real Dairy Droves During the Pandemic*,' Food Navigator-USA (Jun. 1, 2021), https://www.foodnavigator-usa.com/Article/2021/06/01/SPINS-data-shines-light-on-why-consumers-returned-to-real-dairy-in-droves-during-the-pandemic.

[10] *Animal Raising Claims Labeling Guidelines Update*, U.S. Dep't of Agric., Food Safety & Inspection Serv. (Sep. 1, 2021), https://www.fsis.usda.gov/sites/default/files/media_file/2021-09/Animal-Raising-Claims-labeling-and-Non-GMO-slides-2021-09-01.pdf.

[11] The American Society for the Prevention of Cruelty to Animals and Technomic Inc., *Understanding Retailers' Animal Welfare Priorities* (2018), available at https://www.aspca.org/sites/default/files/aspca_2018_understanding_retailers_animal_welfare_prioritie s.pdf.

[12] Bob Meadow and Meryl O'Bryan, Results from a Survey of American Consumers, Lake Research Partners (Feb. 1, 2019), available at https://www.aspca.org/sites/default/files/aspca-2018_animal_welfare_labelling_and_consumer_concern_survey.pdf.

[13] *Id.*

[14] Anna Boisseau, *2021 State of the Industry: Milk is on a Long and Winding Road*, DairyFoods (Nov. 5, 2021), available at https://www.dairyfoods.com/articles/95315-2021-state-of-the-industry-milk-is-on-a-long-and-winding-road.

1  this narrative by rigorously enforcing humane standards, Defendant uses marketing to mask its treatment

2  of cows.

3      22.    Specifically, Defendant states on its cartons that:

4          •    Organic Valley has a "commitment to the highest . . . animal care practices";

5          •    Organic Valley employs "Humane Animal Practices";

6          •    That these "high standards of animal care go above and beyond" other standards

7               since "the best milk comes from happy cows";

8          •    "We Hold Ourselves to the Highest Standards";

9          •    "OUR COWS ARE SOCIAL AND SO ARE WE";

10         •    Organic Valley farms are "growing real food the right way";

11         •    Organic Valley raises cows with "LOVE."

12     23.    These messages are prominently displayed to every consumer who may happen upon

13  Defendant's milk cartons in the grocery aisle—frequently, as seen in the exemplary cartons below,

14  alongside suggestive images of human mothers with their own children:

15



FIRST AMENDED COMPLAINT









24.     These statements do not appear in isolation. In addition to the idyllic imagery seen above, one of Defendant's current product lines—while making the explicit animal welfare commitments described above—actually depicts an image of what any reasonable consumer would infer to be a mother cow and her calf:



25.     Defendant's representations misled Plaintiff into believing Defendant does not engage in needless, inhumane cruelty toward farmed animals, such as by separating cow mothers and babies within days or hours of birth, or by raising calves in a manner that deprives them of vital social bonding, health, and natural sustenance, or by engaging in practices beneath the requirements of other prominent third-party animal welfare standards. Plaintiff would not have paid a premium price for the products if she had known the true nature of Defendant's practices, as set forth herein. Nor, as elaborated further below, would many other consumers who research has shown are willing to pay more specifically for dairy products from production systems that do not involve premature separation of cows and calves.

26.     Defendant uses these false and misleading representations to induce reliance from reasonable consumers like Plaintiff. Early separation of mother cows from their babies is a particular cruelty of the dairy industry. The babies of many other categories of farmed mammals—such as sheep,

FIRST AMENDED COMPLAINT

pigs, horses, and cows used for beef—are frequently housed with their mothers for some meaningful period of time. Cows used in dairy production are an exception, one that reasonable consumers are unaware of due to deceptive packaging like Defendant's.

27.    The implications of this for dairy sellers are well understood. As one study published in 2020 put it, research regarding the "overwhelming" views on calf housing options among American youth and adults lends itself to the conclusion that "housing systems that enable greater degrees of behavioral freedom [including socialization] for calves may be more socially sustainable for the dairy sector."[15]  This is consistent with other published studies showing that separation of mother and baby cows is a subject of particular concern, and is considered an unacceptable practice to many reasonable consumers—and linked to such consumers' willingness to pay more.

28.    For example, a 2015 study including hundreds of diverse U.S.-based consumers found significant majorities agreeing that mother and baby cows should not be separated early—even after reviewing common arguments for and against these practices.[16]  Unsurprisingly, these consumers left the study tending to believe cows were cognitively and emotionally complex, and would suffer undue acute and long-lasting psychological, physiological, and behavioral consequences from early maternal separation.

29.    This finding is far from unique. During a study conducted among North American consumers across 2010 and 2011 with a diverse sample of participants, more than three quarters of those with no prior involvement in the dairy industry answered negatively when asked "Should dairy calves be separated from the cow within the first few hours after birth?," citing concerns including the emotional and physiological health of cow mothers and babies.[17] Notably, "No" was also a popular response to this question among participants with some knowledge of dairy industry standards, such as readers of trade

---

[15] Rielle K. Perttu, Beth A. Ventura, & Marcia I. Endres, *Youth and Adult Public Views of Dairy Calf Housing Options*, 103(9) J. of Dairy Sci. 8507-8517 (Jul. 1, 2020),  https://doi.org/10.3168/jds.2019-17727.

[16] Gesa Busch, Daniel M. Weary, Achim Spiller, & Marina A. von Keyserlingk, *American and German Attitudes Towards Cow-Calf Separation on Dairy Farms*, 12(3) PloS one e0174013 (Mar. 16, 2017), https://doi.org/10.1371/journal.pone.0174013.

[17] Beth A. Ventura , Marina A. von Keyserlingk, Catherine A. Schuppli, & Daniel M. Weary, *Views on Contentious Practices in Dairy Farming: The Case of Early Cow-Calf Separation*, 96(9) J. of Dairy Sci.,  6105–6116. (Sep. 2013), https://doi.org/10.3168/jds.2012-6040.

publications, veterinarians, industry professionals, and even participants recruited at an actual dairy industry conference.[18]

30.     Informed consumers also disapprove of these practices. North American consumers surveyed in 2014 both before and after a self-guided tour of a 500 cow dairy farm emerged more, rather than less, concerned about premature separation of mother and calf.[19]

31.     Some of the most up to date and detailed research into public attitudes toward, and perceptions of, premature separation of mothers and calves was published in early 2022. In that study, researchers surveyed a representative sample of close to 2,000 participants, including 1,487 Americans, who were provided descriptions of cow-calf management systems differing in types of social and maternal contact allowed.[20] The results suggested "low acceptance of any cow-calf management system involving early separation," and that these participants considered "that early separation was a breach of [the] standard of care owed to both cows and calves."[21] All categories of participants, including those who drink milk, expressed unfavorable attitudes "toward all systems involving early separation from the mother, regardless of what form of additional social contact was provided."[22]

32.     Consistent with prior studies, participants explained that their attitudes were inextricably linked to their perceptions of animal welfare, and their willingness to pay premium prices. Participants expressed willingness to pay the same or more for milk from cows who were not separated from their calves prematurely.[23] This was echoed in qualitative findings offered by participants, who frequently described premature maternal separation as unnatural, "unacceptable," "inhumane," and "cruel."[24] Some of the responses provided by participants included the following:

---

[18] *Id.*

[19] Beth A. Ventura, Marina A. von Keyserlingk, Hannah Wittman, & Daniel M. Weary, *What Difference Does a Visit Make? Changes in Animal Welfare Perceptions after Interested Citizens Tour a Dairy Farm*, 11(5) PloS one e0154733 (May 31, 2016), https://doi.org/10.1371/journal.pone.0154733.

[20] Lara V. Sirovica, Caroline Ritter, Hendricks, J., Daniel M. Weary, Sumeet Gulati, & Marina A. von Keyserlingk, *Public Attitude Toward and Perceptions of Dairy Cattle Welfare in Cow-Calf Management Systems Differing in Type of Social and Maternal Contact*, 105(4) J. of Dairy Sci. 3248–3268 (Jan. 28, 2022), https://doi.org/10.3168/jds.2021-21344.

[21] *Id.* at 3248.

[22] *Id.* at 3257.

[23] *Id.* at 3258-65

[24] *Id.* at 3261-63.

- "This is disappointing to learn. I think if more customers of dairy milk were educated [on] this process they would be reluctant to purchase dairy milk."

- "I am really saddened to learn this, both as a human being and a lover of animals. It makes me a lot more self-conscious about what I consume as food products and have more thoughts about the process in which these products are created. It is absolutely shocking to hear how cruel and inhuman the process is. The poor animals are disposable and not looked at as living life forms with emotions. Imagine doing this to a person, how appropriate and sane would that be to do? Any baby needs their mother."

- "It's cruel to take a baby away from mother regardless of human or animal."

- "Separating a calf after birth from the mom is totally unacceptable and inappropriate whatever living being it is."

- "I believe that this management system is entirely unethical and cruel."

- "The idea of separating a mother from their offspring is upsetting. Just because they're animals and they can't stand up for themselves, doesn't mean they don't feel the mother-child connection. It is devastating to hear that they are separated right after birth, an offspring needs their mother."

- "The calf should be with the cow, when you separate them it affects them emotionally."

- "[T]he calf is probably scared because [they have been] separated from [their] mother . . . . On the flip side the mother is probably super depressed after being separated from her calf."

- "It is inhumane to separate them and not allow natural bonding."

- "I feel the calf should be with his mother cow to nurse as that is the most natural thing in nature to do."

- "There is general awareness that cows and calves have an emotional life and the bond between cows and calves have an emotional life and the bond between cow and calf is a concern if separated because it ultimately ends in distress for the calf."

- "It is cruel to separate a mother and her calf and causes stress and anxiety."

- "The calf needs a lot of immunity [they] only get[] from their cow's (mother's) milk. The calf wants to be healthy and free from diseases, [they] need[] cow milk."

- "This method [not separating cow and calf] results in a healthier calf because the calf is able to receive the antibodies for the mother that is critical for good health."

- "It seems a bit cruel to the calves that won't get the benefits of their own mother's antibodies before they are separated."[25]

### Defendant's Premature Separation of Mother Cows and Calves Inflicts Undue Suffering

33.    In more humane settings, mother cows and calves form strong emotional bonds immediately after birth. Just as human mothers and their babies benefit from direct physical contact, cow mothers bond with their babies by rubbing, sniffing, remaining close to, licking, and suckling their calves after birth.



Jo-Anne McArthur / Animal Equality / We Animals Media

34.    Afterwards, mother cows and calves engage in what are referred to as "contact calls," with calves as young as three to five weeks old able to recognize their mothers based on distinct vocal cues. Mother cows remain protective of their calves. For example, in one study, 99 percent of mother cows moved between an unfamiliar approaching vehicle and their calves to provide a protective barrier, despite

[25] *Id.* at 3261-64.

FIRST AMENDED COMPLAINT

the apparent risk.[26] In another study, mothers who were separated from their calves after only five minutes still recognized their own babies even after 12 hours of separation.[27]

35.    There is also physiological evidence of these bonds. Cow mothers who are separated from their calves display increased eye whites, which often indicates fear, stress, or frustration, in addition to other behavioral signs of trauma. Cow mothers who are reunited with their calves display significantly less eye whites, indicating a more positive, calm emotional state.

36.    Mother-calf bonds can also take on unique, individualized characteristics. As referenced, calves are able to selectively respond to their own mother's calls even after a day of separation. Maternal attention, including time spent nursing, is sensitive to individual differences in calf sex and weight. For example, male calves tend to benefit from more frequent nursing and protective behavior compared with female calves. Additionally, more maternal protection and more frequent nursing occurs when calves are born with lower birth weights.

37.    Nevertheless, Defendant's common practice, despite its advertising indicating otherwise, is to inhumanely separate cow mother and baby immediately after birth. Defendant disclosed to the Cornucopia Institute, an organic industry-aligned third-party, its calves are "[r]emoved shortly after birth (standard practice)."[28] Thus, within days or potentially even hours of the birth of a baby calf on many of Defendant's farms, each calf is ripped from his or her mother and never returned.

38.    The pain and suffering this inflicts is as immense is it is needless. Mother cows separated from their calves display various signs of acute distress, including pacing, increased urination, weight loss, increase in stress hormone concentration, locomotor activity including searching behavior, and vocalizing. These behaviors can continue for days. **All** mother cows in one study exhibited these signs of distress after separation and chose to stay at one end of their paddock, vocalizing continuously.[29] This includes the loud, high-pitched, wailing bellows such as can be seen and heard at the video excerpted

---

[26] Marino & Allen, *The Psychology of Cows*, *supra* note 5 at 487.
[27] *Id.* at 484.
[28] The Cornucopia Institute, Grassmilk (Organic Valley) (last accessed May 31, 2022), available at https://www.cornucopia.org/scorecard/dairy/grassmilk-organic-valley/.
[29] Marino & Allen, *The Psychology of Cows*, *supra* note 5 at 484.

below. It can also, and often does, include attempts by mother cows to struggle against the removal of their calves and to chase after them.



https://www.youtube.com/watch?v=zBnZPJJ2QG4

39.    Separated calves display many of these same clinical signs of suffering, including increases in vocalization, stress hormone concentration, weight loss, stress behaviors, and "reuniting behaviors," including forlornly hugging a fence line and standing with heads outside their pens. Earlier weaning also results in less play of all kinds, depriving calves of an important source of emotional enrichment and learning opportunities. Calves who are prematurely separated are also more likely to engage in cross-sucking, or abnormal sucking behavior, and may form an oral fixation with their enclosure that causes them to suck on fixtures or suck on the body of another calf. The latter can cause milk loss in the sucked calf as well as digestive disorders and diarrhea in the sucking calf.

40.    Many of these effects persist for the separated calves. Calves raised without their mothers are more inclined to respond fearfully to unknown objects or to confrontations with unknown cows. One

-15-

FIRST AMENDED COMPLAINT

study found that calves allowed continual access to their mothers in their first 12 weeks of life were more likely to engage in positive activities like exploration, more likely to socialize with other cows, less prone to aggressive postures, and less likely to respond to new situations with stress and fear.[30] Conversely, other studies have demonstrated that adult cows who had suffered early maternal deprivation are less sociable, less able to provide maternal care for their own young, display more behavioral signs of stress, and are less able to cope with new challenges or stimuli.[31]

41.    Early separation may increase susceptibility to serious, even deadly, diseases in both mothers and babies. Stress in cows and calves can be especially high when calves are separated early in life, when the bond between them is strongest and calves are most socially dependent on their mothers.

42.    There is no sufficient welfare or commercial justification for Defendant's practice of premature separation of cow mothers and babies. Many commercial alternatives to separation are available, including systems in which mother cows and their babies have unrestricted access to each other or at least daily contact. Such systems exist, are viable in the U.S., and are common globally, including in countries imposing the types of stronger animal welfare standards Defendant represents to consumers they follow.

43.    Severing of maternal bonds causes separated cows not only emotional distress, but also physiological harm that is costly to both cows and calves. Numerous studies have established that abrupt and premature weaning impairs immune responses in calves, such as by impairing the function of cellular

---

[30] Kathrin Wagner, Daniel Seitner, Kerstin Barth, Rupert Palme, Adreas Futschik, & Susanne Waiblinger, *Effects of Mother Versus Artificial Rearing During the First 12 Weeks of Life on Challenge Responses of Dairy Cows*, 164 Applied Animal Behaviour Sci. 1-11 (2015), https://r.jordan.im/download/mammals/wagner2015.pdf.

[31] *See, e.g.*, Rebecca K. Meagher, Annabelle Beaver, Daniel M. Weary, & Marina A. von Keyserlingk, *Invited review: A Systematic Review of the Effects of Prolonged Cow-Calf Contact on Behavior, Welfare, and Productivity*, 102(7) J. of Dairy Sci. 5765–5783 (May 15, 2019), https://doi.org/10.3168/jds.2018-16021; Marino & Allen, *The Psychology of Cows, supra* note 5; Rolnei R. Daros, Joao H. Costa, Marina J. Hötzel, & Daniel M. Weary, *Separation From the Dam Causes Negative Judgement Bias in Dairy Calves*, 9(5) PloS one e98429 (May 21, 2014), https://doi.org/10.1371/journal.pone.0098429; Tasja Kälber & Kerstin Barth, *Practical Implications of Suckling Systems for Dairy Calves in Organic Production Systems - A Review*, 64(1) Landbauforschung Volkenrode 45-58 (Mar. 2014); Kathrin Wagner, Kerstin Barth, Edna Hillmann, Rupert Palme, Andreas Futschik, & Susanne Waiblinger, *Mother Rearing of Dairy Calves: Reactions to Isolation and to Confrontation with an Unfamiliar Conspecific in a New Environment*, 147 Applied Animal Behaviour Sci. 43-54 (2013).

and other defenses against pathogens necessary to prevent potentially deadly infections.[32] Likewise, there are no protective benefits from premature separation that cannot be achieved through more humane means. Calves reared by their mothers will tend to have higher survival rates.

44.     Further evidence for the commercial viability of alternatives to Defendant's practices, and for the literal falsity of their claims to apply the "highest" animal welfare practices that go "above and beyond" other standards, is supplied by various third-party animal welfare standards for cows used in dairy production. As noted above, a prominent certifier recommends husbandry systems "that allow young calves to remain in the herd with their mothers until weaning occurs naturally," with separation of mother cow and calf to occur only when doing so can "cause as little stress as possible."[33] To qualify for the top two tiers of another certifier's six levels of certification, sellers are required to allow calves to stay with their mothers for at least 168 days, or otherwise make sure calves are fostered for at least 168 days by another nursing cow who is assigned no more than three calves.[34] Despite its promises, Defendant, on information and belief, does not meet these standards.

### *Defendant's Isolation of Calves Inflicts Undue Suffering*

45.     In more natural settings, mother cows introduce their young to other calves to form social groups where they learn how to become well-functioning, healthy adults.

46.     In such settings, calves would socialize freely. This includes engaging in, and deriving significant welfare benefits from, vigorous social play—activities such as play-fighting, galloping, bucking, and kicking. Calves begin engaging in these sorts of play behaviors around the second week of life, actively seek companions, and play the most around the age of four months. Cows and calves free from confinement play more, such as by galloping, bucking, and kicking up their heels. Calves raised with peers tend to engage in more play.

---

[32] *See, e.g.*, Kälber & Barth, *Practical Implications of Suckling Systems*, *supra* note 31; Eilish Lynch *et al.*, *Effect of Abrupt Weaning at Housing on Leukocyte Distribution, Functional Activity of Neutrophils, and Acute Phase Protein Response of Beef Calves*, 6 BMC Vet Res 39 (2010), https://doi.org/10.1186/1746-6148-6-39.
[33] Animal Welfare Approved by AGW, *Certified Animal Welfare Approved by AGW Standards for Dairy Cattle*, *supra* note 3.
[34] Global Animal Partnership, *5-Step® Animal Welfare Pilot Standards*, *supra* note 4.

47.    Play is not the only life skill young cows learn from each other. For example, cows allowed to interact with experienced grazers will pick up grazing behaviors more quickly. In addition, calves raised with peers may be able to smell food odors on the breath of their companions, making them more willing to consume new foods.

48.    Cows raised together will form strong, complex, individualized social bonds. If raised in proximity to their peers, cows learn to interact with favored peers with compatible personalities. Cows can differentiate amongst their cow peers in a variety of circumstances and retain information about individual cows for extensive periods of time. In multiple studies, cows have shown skill at discriminating between photographs of familiar and unfamiliar cows.[35] Calves who are raised together will often be seen lying together, as well as engaging in social behaviors including showing affection and grooming each other. Social grooming is very beneficial for cows because it reduces tension and has a calming effect, helps maintain bonds and group cohesion, and can produce a positive emotional response in the recipient. Raising cows together also carries other long-term psychological and physiological benefits. Studies routinely show calves raised with more social interaction eat more, gain more weight, are more likely to eat new foods, are better learners, are less fearful, are less reactive to humans, and retain more ability to cope with change—among various signs of contentment and security.[36] Additionally, calves are highly motivated to seek out full body contact with other calves.

---

[35] Marino & Allen, *The Psychology of Cows*, *supra* note 5 at 478-79.

[36] *See, e.g.*, Joao H. Costa, Marina A. von Keyserlingk, & Daniel M. Weary, *Invited Review: Effects of Group Housing of Dairy Calves on Behavior, Cognition, Performance, and Health*, 99(4) J. of Dairy Sci. 2453–2467 (Feb. 10, 2016), https://doi.org/10.3168/jds.2015-10144; Rebecca K. Meagher, Rolnei R. Daros, Joao H. Costa, Marina A. von Keyserlingk, Maria J. Hötzel, & Daniel M. Weary, *Effects of Degree and Timing of Social Housing on Reversal Learning and Response to Novel Objects in Dairy Calves*, 10(8) PloS one e0132828 (Aug. 14, 2014), https://doi.org/10.1371/journal.pone.0132828; Margit B. Jensen & Lars E. Larsen, *Effects of Level of Social Contact on Dairy Calf Behavior and Health*, 97(8) J. of Dairy Sci. 5035–5044 (Aug. 2014) https://doi.org/10.3168/jds.2013-7311; Joao H. Costa, Rolnei R. Daros, Marina A. von Keyserlingk, & Daniel M. Weary, *Complex Social Housing Reduces Food Neophobia in Dairy Calves*, 97(12) J. of Dairy Sci. 7804–7810 (Oct. 11, 2014), https://doi.org/10.3168/jds.2014-8392; Margit B. Jensen & Daniel M. Weary, *Group Housing and Milk Feeding of Dairy Calves*, 25 WCDS Advances in Dairy Tech. 179-189 (2013), https://wcds.ualberta.ca/wp-content/uploads/sites/57/wcds_archive/Archive/2013/Manuscripts/p%20179%20-%20192%20Jensen.pdf; Andreia De Paula Vieira, Anne Marie B. de Passillé, & Daniel M. Weary, *Effects of the Early Social Environment on Behavioral Responses of Dairy Calves to Novel*

49.     Defendant, on information and belief, denies calves these demonstrated benefits, raising many calves for dairy production in individual isolation pens. These unfortunate calves are housed in individual hutches—small four-sided pens usually constructed of fiberglass, polyethylene, or wood. Calves are either tethered to hutches or restricted by fencing. While in these hutches, calves are alone, isolated from their mothers and other members of their species, until they reach an age where they will rejoin the herd, be impregnated, and begin to produce milk. The below image shows an interior of an industry-standard hutch:



**Jo-Anne McArthur / We Animals Media**

50.     On information and belief, some farms supplying Defendant rear female calves in small hutches, including those pictured below in photographs available on Google Earth of farms supplying Defendant located in Valley Ford, Petaluma, and Manchester, California:

//

//

//

_Events_, 95(9) J. of Dairy Sci. 5149–5155 (Sep. 1, 2012), https://doi.org/10.3168/jds.2011-5073; Linda R. Duve, Daniel M. Weary, Ulrich Halekoh, & Margit B. Jensen, _The Effects of Social Contact and Milk Allowance on Responses to Handling, Play, and Social Behavior in Young Dairy Calves_, 95(11) J. of Dairy Sci. 6571–6581 (Nov. 2012),  https://doi.org/10.3168/jds.2011-5170.

FIRST AMENDED COMPLAINT

1

2

3

4

5

6

7

8



9

10

11

12

13

14

15

16

17

18



19

20

21

22

23

24

25

26

27



28

51.     The suffering isolation causes is immense in both the short and long terms. As with other species, research has shown that isolation results in behavioral and developmental harm to calves. Absent sufficient opportunities for interaction, calves will resort to unsatisfying redirected behaviors such as licking or sucking on fixtures in their pens, as well as on their own fur and skin. Calves reared in isolation also show symptoms of physical, cognitive, sensory, and social deprivation, including both short and long-term difficulties in coping with novel situations and poorer learning abilities compared with group housed and mother-raised calves.

52.     No sufficient welfare or commercial justification exists for Defendant's isolation of calves. Many alternative systems exist and operate in the U.S. and globally, and such systems can be profitable. Social housing improves calves' welfare without compromising calf health, or necessarily increasing expense. For example, all health risks associated with social housing can be mitigated with basic management, while the health benefits and weight gains from social housing are manifest.

53.     Further evidence for the commercial viability of alternatives to Defendant's practices, and that Defendant's claims that it applies the "highest" animal welfare practices that go "above and beyond" other standards are misleading, is supplied by various third-party animal welfare standards for cows used in dairy production. For example, one prominent certifier requires that all weaned calves "must be kept in groups of familiar animals."[37] To qualify for even the lowest of any of the six tiers of another certifier's six levels of certification, sellers are required to allow calves who are not kept with their mothers or with nurse cows to be kept with small groups of other calves, or at least in a same sex pair, and to have visual contact with other calves. This requirement is moot for sellers meeting this certifier's top two tiers of certification, as they are required to keep calves with their mothers or else with nurse cows.[38] Despite its representations to the contrary, Defendant, on information and belief, does not meet these standards.

### *Defendant's Deprivation of Adequate Sustenance to Calves Inflicts Undue Suffering*

54.     Standard practice in the dairy industry results in feeding individually-reared calves minimal sustenance, far below what they would consume from their mother. Defendant, despite its

---

[37] Animal Welfare Approved by AGW, *Certified Animal Welfare Approved by AGW Standards for Dairy Cattle*, *supra* note 3.

[38] Global Animal Partnership, *5-Step® Animal Welfare Pilot Standards*, *supra* note 4.

advertising, on information and belief, follows similar practices, and therefore, on information and belief, Defendant deprives these calves of adequate milk.

55.     These practices are associated with poor growth and chronic hunger in calves. Early in life, it is difficult for calves to ingest sufficient amounts of feed to meet their nutrient demands when fed artificially. Studies routinely find a large discrepancy between the amount of milk consumed by calves raised in insufficient social environments on dairy farms, and the far larger amount calves will drink when allowed to suckle freely in more natural settings.[39]

56.     Hunger is not the only condition that causes calves deprived of milk to suffer. A contributing factor to the reduction in beneficial play behavior shown by newly separated calves is reduced energy intake. Lack of sufficient nutrients reduces immune health and resilience to lower temperatures, and can itself cause numerous painful and deadly conditions. Conversely, when calves can feed at will they show fewer abnormal behaviors, higher rumination, increased play behavior, and improved mortality rates.

57.     No sufficient welfare or commercial justification exists for the deprivation inflicted, on information and belief, by Defendant. Rather, as one would expect from the basic facts of cow physiology, cognition, and social structure, this lack of sustenance stems from the needless practices discussed above.

58.     Further evidence for the commercial viability of alternatives to Defendant's practices, and that its claims to apply the "highest" animal welfare practices that go "above and beyond" other standards are misleading, is supplied by various third-party animal welfare standards for cows used in dairy production that, as elaborated above, instruct sellers not to wean calves until an appropriate age. Despite its promises, Defendant, on information and belief, does not meet these standards.

---

[39] *See, e.g.*, Costa, von Keyserlingk, & Weary, *Effects of Group Housing of Dairy Calves*, *supra* note 36; Costa, Daros, von Keyserlingk, & Weary, *Complex Social Housing*, *supra* note 36; Jensen & Larsen, *Effects of Level of Social Contact*, *supra* note 36; Jensen & Weary, *Group Housing and Milk Feeding*, *supra* note 36; De Paula Vieira, de Passillé, & Weary, *Effects of the Early Social Environment*, *supra* note 36; Andreia De Paula Vieira, Marina A. von Keyserlingk, & Daniel M. Weary, *Presence of an Older Weaned Companion Influences Feeding Behavior and Improves Performance of Dairy Calves Before and After Weaning From Milk*, 95(6) J. of Dairy Sci. 3218–3224 (Jun. 2012), https://doi.org/10.3168/jds.2011-4821.

*Undue Suffering From Maternal Separation and Isolation Lasts Until Death*

59.     The above descriptions of the long-term effects of early separation of mother cows and their babies, and consequent housing of calves in social isolation, are not the end of these animals' suffering. Within the dairy industry, male calves' eventual destination, following their sale into the meat industry, is typically a commercial slaughterhouse. Likewise, at their new facilities or locations, female calves are either raised as "herd replacement" for the dairy business, or sold to other businesses, so that they can continue this cycle. If they did not previously succumb to conditions caused by their deprivation, females who are no longer at peak commercial value after their milk production levels drop will typically end up at the slaughterhouse too.

60.     The natural lifespan of a cow is 15-20 years. Nevertheless, despite Defendant's advertising, the ultimate fate of male calves born on their farms, after short lives of deprivation, is being trucked by third parties to commercial farms that raise them for meat. Ultimately, on information and belief, all of Defendant's cows who survive long enough to see their milk production levels drop— Defendant is listed by Cornucopia as having a "[m]oderate cull/death rate" that "[w]ill vary widely between farms"[40]—will be sold and suffer premature deaths, or what Defendant refers to as "harvest," at commercial "slaughter plants."[41]  Per an explanation published by Defendant in January 2020—in a difficult to find and navigate question-and-answer section linked at the bottom of Defendant's website— these cows are killed after being "stunned with a captive bolt in the middle of the skull and then the[ir] throat is slit to bleed them out."[42]

## IV.    CLASS ALLEGATIONS

61.     Plaintiff brings this action individually, as well as on behalf of each and all other persons similarly situated, and seeks class certification under California Code of Civil Procedure § 382.

62.     All claims alleged herein arise under California law for which Plaintiff seeks relief authorized by California law.

---

[40] The Cornucopia Institute, Grassmilk, *supra* note 28.
[41] *What are Organic Prairie's slaughter practices?*, Organic Valley (Jan. 21, 2020), available at https://organicvalley.force.com/custhelp/s/article/What-are-Organic-Prairies-slaughter-practices.
[42] *Id.*

63.     Pursuant to California Code of Civil Procedure § 382, Plaintiff brings this action on behalf of the following Class:

> California Class: Every person in California who purchased Organic Valley dairy products which Defendant represented were made with any of the following qualities: a "commitment to the highest . . . animal care practices," "humane" practices, "high" or "highest" standards of animal care that "go above and beyond other standards," or cows that are "social." Excluded from the Class are governmental entities, Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Class are any judges, justices or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

64.     **Numerosity:**  The proposed Class is so numerous that individual joinder of all the members is impracticable. Due to the nature of the trade and commerce involved, while Plaintiff does not know the exact number of class members in the Class, she believes them to be in the tens of thousands, if not more. Joinder is also impractical because members of the Class are unlikely to be aware of their rights, and because Class members are unlikely to prosecute such claims on an individual basis since the amounts at stake for many members of the Class may not be sufficient to enable them to maintain separate suits against Defendant. While the exact number and identities of all members of the Class are unknown at this time, such information can be ascertained through appropriate investigation and discovery, such as through Defendant's and/or Defendant's agents' records or by public notice.

65.     **Common Questions of Law and Fact Predominate:** There are many questions of law and fact common to the representative Plaintiff and the Class, and those questions substantially predominate over any questions that may affect individual members of the Class. The common questions of law and fact include, but are not limited to, the following:

> i.     Whether Defendant's misleading and deceptive business practice as alleged herein violated sections (a)(2), (a)(3), (a)(5), (a)(7), and (a)(14) of the CLRA;
>
> ii.    Whether Defendant's misleading and deceptive business practice as alleged herein is an unlawful, unfair or fraudulent business practice under the UCL;
>
> iii.   Whether Defendant's misleading and deceptive business practice as alleged herein fraudulently induced Plaintiff and the Class to purchase its dairy products;

iv.     Whether Plaintiff and the Class are entitled to restitution of all money obtained by Defendant through its common and uniform scheme;

v.      Whether Plaintiff and the Class are entitled to prospective injunctive relief enjoining Defendant from continuing to engage in the deceptive, unlawful, and unfair business practices alleged herein;

vi.     Whether Plaintiff and the Class are entitled to declaratory relief holding Defendant's business practices alleged herein are unlawful;

vii.    The nature and extent of damages and other remedies to which the conduct of Defendant entitles members of the putative Class.

66.     These common questions of law and fact predominate over questions that may affect individual class members in that the claims of all members of the Class for each of the claims herein can be established with common proof. Additionally, a class action would be "superior to other available methods for the fair and efficient adjudication of the controversy" because: (1) members of the Class have little interest in individually controlling the prosecution of separate actions given that individual damages claims of each member of the Class are not substantial enough to warrant individual filings; (2) Plaintiff is not aware of other lawsuits against Defendant commenced by or on behalf of members of the Class; and (3) the conduct alleged is common to all members of the Class and because resolution of the claims of Plaintiff will resolve the claims of the remaining Class, certification does not pose any manageability problems.

67.     **Typicality:** Plaintiff's claims are typical of the claims of the Class, which all arise from the same questions of law and facts involving Defendant's practices. Plaintiff and all members of the Class have been similarly affected by Defendant's conduct as they all purchased and paid premium prices for dairy products Defendant represented in a particular manner on the product packaging, and were deceived.

68.     **Adequacy of Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in handling complex class action litigation. Plaintiff and her counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so.

69.    **Superiority of Class Action:** Plaintiff and the members of the Class suffered and will continue to suffer harm as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the present controversy. Members of the Class have little interest in individually controlling the prosecution of separate actions because the individual damages Claims of each member of the Class are not substantial enough to warrant individual filings. Because joinder of all members of the Class is impractical, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. A class action will also mitigate the risk of inconsistent or varying adjudications of the issues presented, which, in turn, could establish incompatible standards of conduct for Defendant. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy. In sum, for many, if not most, members of the Class, a class action is the only feasible mechanism that will allow them an opportunity for legal redress and justice.

70.    Adjudication of individual claims of members of the Class with respect to Defendant would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication, and could substantially impair or impede the ability of other members of the Class to protect their interests.

71.    Among other relief, Plaintiff and the other Class members seek declaratory and injunctive relief against Defendant to prevent Defendant from committing further violations of California law, including by inflicting economic injury on additional California consumers by inducing them to buy products that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and labelling, and by inducing them to pay excessive premium prices they would not have paid absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and labelling.

72.    Defendant has acted on grounds generally applicable to the Class, thereby making appropriate final relief with respect to the Class as a whole.

## V.    INADEQUATE REMEDY AT LAW

73.    Legal remedies available to Plaintiff are inadequate because they are not equally prompt, certain and efficient as equitable relief. Restitution under the UCL can be awarded in situations where the entitlement to damages are not available. Additionally, damages and restitution are not necessarily the same amount, as restitution is not limited to the amount of money Defendant wrongfully acquired plus the legal rate of interest, but rather entitles the Plaintiff to recover all profits from Defendant's wrongdoing. Legal remedies are also inadequate to prevent future harm. Absent injunctive relief, Plaintiff will be unable to rely on the Defendant's advertising or labeling in the future, and so will not purchase the products although she would like to if Defendant were to treat cows in a manner consistent with its advertising.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### *Violations of Cal. Civ. Code §§ 1750-1785 (the "CLRA")*

### (By Plaintiff and the Class Against Defendant)

74.    Plaintiff, on behalf of herself and other Class members, restates and incorporates by reference each and every allegation contained in paragraphs 1 to 73 as though set forth fully herein.

75.    The Consumer Legal Remedies Act creates a non-exclusive statutory remedy for unfair methods of competition and unfair or deceptive acts or business practices. *See Reveles v. Toyota by the Bay* (1997), 57 Cal.App.4th 1139, 1164. Its self-declared purpose is to protect consumers against these unfair and deceptive business practices, and to provide efficient and economical procedures to secure such protection. Cal. Civ. Code § 1760. The CLRA was designed to be liberally construed and applied in favor of consumers to promote its underlying purposes.

76.    Plaintiff and the other Class members are "consumers," as the term is defined by California Civil Code § 1761(d), because they bought the products at issue for personal, family, or household purposes.

77.    Plaintiff and Defendant, and the other Class members and Defendant, have engaged in "transactions," as that term is defined by California Civil Code §1761(e).

78.    The conduct alleged in this complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA and the conduct was undertaken by Defendant in transactions intended to result in, and which did result in, the sale of goods to consumers.

79.    Defendant has violated the CLRA by representing to Plaintiff and the other Class members that it has a "commitment to the highest . . . animal care practices," that it employs "humane" practices, that its "high" or "highest" standards of animal care "go above and beyond other standards," and that its cows are "social," when its business practices are not so and the cows are actually isolated.

80.    More specifically, Plaintiff alleges that Defendant has violated paragraphs 2, 3, 5, 7, and 9 of California Civil Code § 1770(a) by engaging in the unfair and/or deceptive acts and practices set forth herein. Defendant's unfair and deceptive business practices in misrepresenting the nature of its business were and are intended to, and did result in, numerous individuals, including Plaintiff, being deceived, in violation of California Civil Code § 1770, *et seq.* Members of the putative Class were damaged in that they paid for products they would not have purchased at all, or would not have paid premium prices for, had they known the truth.

81.    Defendant's violations of the CLRA are ongoing, and Plaintiff and other Class members are seriously threatened, may be irreparably harmed, and denied an effective and complete remedy if, pursuant to California Civil Code § 1780(a)(2) and (a)(5), this Court does not enter injunctive relief that includes, but is not limited to, a requirement that Defendant remove and refrain from making statements in its dairy advertising or on dairy product packaging representing that it has a "commitment to the highest . . . animal care practices," that it employs "humane" practices, that its "high" or "highest" standards of animal care "go above and beyond other standards," and that its cows are "social."

82.    On April 23, 2022, Plaintiff sent a letter to Defendant via certified mail that provided notice of Defendant's CLRA violations and demanded that within thirty (30) days from that date, Defendant correct, repair, replace, or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. The letter also stated that if Defendant refused to do so, Plaintiff would file a complaint seeking damages and other available relief in accordance with the CLRA's provisions. In response, Defendant did not comply with Plaintiff's demands in the CLRA letter, and to date has not so complied. Plaintiff and other Class members have suffered substantial economic injury by virtue of

buying products that they would not have purchased absent Defendant's unlawful conduct, or by virtue of paying an excessive premium price they would not have paid absent Defendant's unlawful conduct.

## SECOND CAUSE OF ACTION

### *Violations of Business & Professions Code Section 17200 et seq. (the "UCL")*

### **(By Plaintiff and the Class Against Defendant)**

83.     Plaintiff, on behalf of herself and other Class members, restates and incorporates by reference each and every allegation contained in paragraphs 1 to 82 as if fully set forth herein.

84.     California Business & Professions Code § 17200 *et seq.* authorizes private lawsuits to enjoin acts of "unfair competition," which include any unlawful, unfair, or fraudulent business practice.

85.     The UCL imposes strict liability. Plaintiff need not prove that Defendant intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—only that such practices occurred.

86.     By committing the acts and practices alleged above, Defendant has violated the UCL, Cal. Bus. & Prof. Code §§ 17200-17210, as to Plaintiff and the Class, by engaging in unlawful, fraudulent, and unfair conduct in violation of the UCL's three independent prongs for liability.

87.     **Unlawful Practices**. Defendant's conduct is in violation of the UCL's proscription against engaging in ***unlawful*** conduct as a result of: numerous violations of the CLRA's provisions, as set forth above, as it violates CLRA §§ 1770(a)(2), (a)(3), (a)(5), (a)(7), and (a)(9). Defendant's business practices alleged herein, therefore, violate California statutes and are thus unlawful within the meaning of the UCL.

88.     **Unfair Business Practices.** The harm to Plaintiff and members of the public outweighs the utility of Defendant's practices and, consequently, Defendant's practices, as set forth fully above, constitute an unfair business act or practice within the meaning of the UCL.

89.     Plaintiff and other Class members have suffered a substantial economic injury by virtue of buying products based on Defendant's misrepresentations. There is no benefit to consumers or competition from Defendant's deceptive conduct. Further, the gravity of harm caused by Defendant's conduct as described above outweighs any justification, motive, or reason for it, particularly considering the viability of legal and humane alternatives. Based on this, Defendant's practices are additionally unfair

because they have caused Plaintiff and the Class substantial injury, which is not outweighed by any countervailing benefits to consumers or to competition, and which is not an injury the consumers themselves could have reasonably avoided.

90.     **Fraudulent Business Practices**. Defendant's practices, as set forth above, also violate the UCL's proscription against engaging in *fraudulent* conduct. Defendant's practices are likely to mislead the general public in the future. Consequently, Defendant's practices constitute a fraudulent business practice within the meaning of the UCL.

91.     Pursuant to California Business & Professions Code § 17204, an action for unfair competition may be brought by any "person … who has suffered injury in fact and has lost money or property as a result of such unfair competition." Defendant's misleading business practice directly and seriously injured Plaintiff and the putative Class who were thus deprived of their property rights.

92.     Defendant's violations of the UCL are ongoing, and present an ongoing threat if, pursuant to California Business & Professions Code § 17203, this Court does not enter an order that includes, but is not limited to, requirements that: (1) Defendant remove and refrain from making representations in its dairy advertising or on dairy product packaging stating that it has a "commitment to the highest . . . animal care practices," that it employs "humane" practices," that its "high" or "highest" standards of animal care "go above and beyond other standards," and that its cows are "social"; (2) Defendant be enjoined from depriving calves of adequate milk, housing calves in isolation, and separating baby cows and their mothers prior to natural weaning; (3) Defendant provide restitution to Plaintiff and other Class members; and (4) Defendant disgorge all revenues obtained as a result of violations of the UCL.

## RELIEF REQUESTED

WHEREFORE, Plaintiff, on behalf of themselves and other Class members, respectfully requests that this Court:

A.     Certify the proposed Class; appoint Plaintiff as representative of the Class; and appoint Plaintiff's undersigned counsel as Class counsel;

B.     Declare that Defendant violates the CLRA and the UCL by (1) depriving calves of adequate milk, (2) housing calves in isolation, and (3) separating baby cows and their mothers prior to natural weaning.

C.    Declare that Defendant is financially responsible for notifying Class members of the pendency of this suit.

D.    Order Defendant to remove and refrain from making representations in its dairy advertising or on dairy product packaging stating, implying by necessary implication, concealing, or omitting that it has a "commitment to the highest . . . animal care practices," that it employs "humane" practices, that its "high" or "highest" standards of animal care "go above and beyond other standards," that its cows are "social."

E.    Enjoin Defendant from violating the law by continuing to (1) deprive calves of adequate milk, (2) house calves in isolation, and (3) separate baby cows and their mothers prior to natural weaning.

F.    Award compensatory damages as requested herein, including restitution pursuant to California Business & Professions Code §§ 17203 and 17535 for Plaintiff and other Class members.

G.    Award disgorgement pursuant to California Business & Professions Code §§ 17203 and 17535 for Plaintiff and other Class members.

H.    Award exemplary damages in light of Defendant's fraud, malice and conscious disregard for the rights of Plaintiff and putative Class members.

I.    Award Plaintiff and the other Class members the reasonable costs and expenses of suit, including their attorneys' fees, pursuant to the CLRA and the common law private attorney general doctrine.

//

//

FIRST AMENDED COMPLAINT

J.      Grant Plaintiff and the other Class members such other and further relief as the Court deems just and proper.

Date:    June 16, 2023                       Respectfully submitted,

*[signature]*

**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP**
HELEN I. ZELDES (SBN 220051)
*hzeldes@sshhzlaw.com*
JOSHUA A. FIELDS (SBN 242938)
*jfields@sshhzlaw.com*
AYA DARDARI (SBN 344039)
*adardari@sshhzlaw.com*
501 W. Broadway, Suite 800
San Diego, CA 92101
Tel: (619) 400-4990

**PETA Foundation**
Asher Smith (admitted *pro hac vice*)
*ashers@petaf.org*
Tala DiBenedetto (admitted *pro hac vice*)
*talad@petaf.org*
MICHAEL E. WALLER (*pro hac vice* application pending)
*mikew@petaf.org*
2154 West Sunset Boulevard
Los Angeles, CA 90026
Tel:  (323) 210-2263
Fax: (213) 484-1648

**REESE LLP**
MICHAEL R. REESE (SBN 206773)
*mreese@reesellp.com*
100 West 93rd Street, 16th Floor
New York, New York 10025
Tel: (212) 643-0500

**REESE LLP**
GEORGE V. GRANADE (SBN 316050)
*ggranade@reesellp.com*
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Tel: (310) 393-0070
Fax: (212) 253-4272

*Counsel for Plaintiff Amber Takahashi- Mendoza, an individual, on behalf of herself and all others similarly situated.*

-32-

## DEMAND FOR JURY TRIAL

Plaintiff hereby demand a trial by jury on all claims so triable.


Date:    June 16, 2023                              Respectfully submitted,


**SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP**
HELEN I. ZELDES (SBN 220051)
*hzeldes@sshhzlaw.com*
JOSHUA A. FIELDS (SBN 242938)
*jfields@sshhzlaw.com*
AYA DARDARI (SBN 344039)
*adardari@sshhzlaw.com*
501 W. Broadway, Suite 800
San Diego, CA 92101
Tel: (619) 400-4990

**PETA Foundation**
Asher Smith (admitted *pro hac vice*)
*ashers@petaf.org*
Tala DiBenedetto (admitted *pro hac vice*)
*talad@petaf.org*
MICHAEL E. WALLER (*pro hac vice* application pending)
*mikew@petaf.org*
2154 West Sunset Boulevard
Los Angeles, CA 90026
Tel:  (323) 210-2263
Fax: (213) 484-1648

**REESE LLP**
MICHAEL R. REESE (SBN 206773)
*mreese@reesellp.com*
100 West 93rd Street, 16th Floor
New York, New York 10025
Tel: (212) 643-0500

**REESE LLP**
GEORGE V. GRANADE (SBN 316050)
*ggranade@reesellp.com*
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Tel: (310) 393-0070
Fax: (212) 253-4272

*Counsel for Plaintiff Amber Takahashi- Mendoza,
an individual, on behalf of herself and all others
similarly situated.*

-33-

FIRST AMENDED COMPLAINT